IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:99-HC-149-H

GREGORY FLINT TAYLOR, )
)
Petitioner, )
)
v. ) ORDER
)
JOE HAMILTON, et al., )
)
Respondents. )

Gregory Flint Taylor, a state inmate, petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondents have moved for summary judgment, Petitioner has responded, and the matter is ripe for disposition.

**STATEMENT OF THE CASE**

On April 19, 1993, Petitioner was convicted following a trial by jury in the Superior Court of Wake County of first-degree murder and sentenced to life imprisonment. His appeal to the North Carolina Supreme Court was denied on September 9, 1994. He subsequently filed a motion for appropriate relief(MAR) in the Superior Court of Wake County and this was denied on December 10, 1998, following an evidentiary hearing. A petition for writ of certiorari was filed in the North Carolina Supreme Court. The petition was denied on March 4, 1999.

During his criminal proceedings, Petitioner was initially represented James Blackburn and R. L. Adams of Smith, Helms, Mulliss, and Moore of Raleigh. When Blackburn had to withdraw from the case, Petitioner hired Michael Dodd to represent him and Adams continued to work with Dodd.

## STATEMENT OF THE FACTS

The facts, as determined by the Supreme Court of North Carolina, show that Officer Brad Kenan saw a woman's body lying in the street on a cul-de-sac at the end of Blount Street in Raleigh, North Carolina at 7:30 a.m. on the morning of September 26, 1991. The dead woman's clothes were torn and pants were down around her ankles. The officer observed two holes in the victim's head and several cuts between her breasts. The victim was later identified by her finger prints as Jacquetta Thomas. Paraphernalia associated with the use of cocaine and crack cocaine were also found in the cul-de-sac. Petitioner's truck was found stuck at the end of a dirt road which led off the cul-de-sac. When Petitioner returned early that morning to retrieve his truck, the police were there investigating the murder.

When Petitioner arrived at the scene, Detective Johnny Howard asked him to go to the police station for questioning. This interview was recorded. Petitioner told the police that he left home in his Pathfinder around 6:00 p.m. on September 25, 1991 and went to a friend's house where he stayed until about 9:30 p.m. He then went to another friend's house where he drank beer and became intoxicated. He then went to Johnny Beck's house around 11:30 p.m. where he smoked cocaine and drank more beer. He and Beck went to Beck's brother's house and stayed from around 1:00 a.m. until about 2:30 a.m., on September 26. Petitioner and Beck bought cocaine and drove into the cul-de-sac where the victim's body was found. He told police he did not see the body when they arrived. He stated that he and Beck saw the service road and decided to go "four-wheeling" in his Pathfinder. They drove down the service road and became stuck in the

2

ravine where they smoked more cocaine. He and Beck then got out of the truck and started walking north on South Blount Street when Beck saw the body in the cul-de-sac. After they walked further, Beck turned around and said he saw a person standing in the cul-de-sac. Petitioner then turned and saw the person. Beck and Petitioner walked to a busier street where they were picked up by a woman who drove them to a "rock" house. They stayed there using drugs until about 6:00 a.m. The woman drove Beck home and left Petitioner at a gas station where his wife picked him up. Petitioner repeatedly stated that he did know the victim, had not seen her before, and that she had never been in his vehicle.

Eva Marie Kelly testified that she was prostitute living at 419 East Street in southeast Raleigh o September 25, 1991. She stated that she saw a white man, whom she identified as Petitioner, and his black male passenger in her neighborhood that night and during the early morning hours of September 26. According to Kelly, the Pathfinder stopped in front of her house in the evening and she went up to the passenger door and spoke with the black man in the passenger seat. The black man asked if she wanted to get high and party with them. He displayed money and cocaine rocks and there was more cocaine in little plastic bags. Kelly did not get in the vehicle and the two men left.

When Kelly came home later in the evening, a black female named Jackie and one named Whoopie were in the kitchen with the two men she had seen earlier in the Pathfinder. Syringes were on the table and the group was smoking crack. Kelly left with her date, but when she returned she saw Jackie leaving by the kitchen door with the two men. She saw the Pathfinder traveling on Cabarrus Street and recognized it as the one

she had seen earlier. She identified Petitioner as the man she saw with Jackie in the kitchen and leaving with that night. She also identified him as the one driving the Pathfinder.

Ernest Andrews testified that he was in the Wake County Jail when Petitioner was placed in a cell with him. According to Andrews, he and Petitioner had several conversations while they were together. Petitioner told Andrews he was charged with murder. When another inmate asked Petitioner how the victim died, he responded that she died "with a smile on her face." Petitioner later added that she was "cut from ear to ear, throat cut."

William E. Hensley of the City-County Bureau of Identification testified that technicians determined that the Pathfinder had been driven through the pool of blood found by the body. He further testified that the vehicle traveled in a northerly direction and circled around to the southwest before going over the curb and south up the gravel service road. Traces of blood were found on the passenger side front fender, passenger side A-frame and on the passenger side front wheel-well liner of Petitioner's Pathfinder. After a *voir dire* hearing, the trial court concluded the evidence that a purebread bloodhound had indicated the scent of the murder victim was in, on, or about the Pathfinder. The jury heard evidence that Officer Andy Currin took the bloodhound, Sadie, to the cul-de-sac and prepared a scent directly from the victim's body. After Sadie was presented with the scent and was commanded to "find," the dog headed southeast in a "zig-zag" manner to the gravel service road leading form the cul-de-sac and toward the Pathfinder. Sadie turned to Officer Currin indicating that the scent had stopped prior to or at the bottom of the

4

embankment. Sadie was taken to the top of the ridge, about thirty feet from the Pathfinder and again given the command to "find." She circled searching for the victim's scent. When she was fifteen or twenty feet from the Pathfinder, she went directly to the driver's door and around to the passenger side door. She jumped both doors. Officer Currin testified that Sadie's actions indicated the victim's scent was in, on, or around the vehicle.

Dr. Deborah L. Radisch, Associate Chief Medical Examiner, testified that the autopsy she performed on the victims's body showed cuts and stab wounds. She concluded, however, that the cause of death was blunt force injuries to the head and neck. There was no evidence that the victim was struck by a vehicle. Drug testing revealed a very high concentration of cocaine in the body. The wounds indicated the victim had been alive in the cul-de-sac and had been killed there.

At the close of the State's evidence and again at the close of all the evidence, Petitioner moved to dismiss the murder charge against him on the ground that there was insufficient evidence that he committed the crime. Petitioner's motions were denied. Petitioner presented no evidence at his trial.

### COURT'S DISCUSSION

I.  **Taylor's Ground's for Relief**

As grounds for relief, Petitioner states: (1) trial counsel were ineffective for failing to object to testimony including out-of-court statements which were inadmissible hearsay; (2) trial counsel failed to adequately prepare for trial, in that they did not interview witnesses who were essential to Petitioner's defense; (3) trial counsel were ineffective for failing to adequately prepare to confront or cross-examine the testimony of the State's

canine expert; (4) trial counsel were ineffective for failure to object to the testimony of Eva Marie Kelly, a prostitute, who testified in exchange for sentence concessions by the State in her own case; (5) trial counsel were ineffective for failure to object prosecutor's improper statements in his closing argument; and (6) trial counsel were ineffective for failing to adequately advise Plaintiff about whether he should testify in his own defense.

## II.     Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986). The party seeking summary judgment must come forward and demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). When making a summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255.

The Antiterrorism and Effective Death Penalty Act(AEDPA) imposes limitations on federal review of state court decisions. When reviewing habeas petitions involving claims adjudicated on the merits in state court, federal habeas may be granted only if the state court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d)(2).

In reviewing this case, we first determine that Petitioner's claims were adjudicated on the merits in the State court MAR hearing. Therefore, habeas may be granted only if the standard set forth above is met. Petitioner contends the State court decision on the merits of his claims as presented in his motion for appropriate relief was unreasonable and contrary to federal law.

A state court's decision is contrary to clearly established federal law as determined by the Supreme Court if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 120 S.Ct. 1495, 1523 (2000). A state court decision involves an unreasonable application of clearly established federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* The Fourth Circuit in *Fisher v. Lee*, 215 F.3d 438, 447 (4th Cir. 2000), in construing *Williams,* pointed out that "'an unreasonable application of federal law is different from an incorrect application of federal law.'" A federal court considering a habeas petition may not therefore issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly, but may do so only if the application is also unreasonable. *Williams*, 120 S.Ct. at 1523.

7

## III. Ineffective Assistance of Counsel

The standard upon which claims of ineffective assistance of counsel are reviewed is that set forth in *Strickland v. Washington*, 466 U.S, 668 (1984). Under *Strickland* the petitioner must first show that counsel's performance was deficient by showing that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 687. Second, a petitioner must show that the deficient performance prejudiced his defense. *Id.* The second component requires a showing that counsel's errors were so serious as to deprive the petitioner of a fair trial. *Id.*

In reviewing Petitioner's claims of ineffective assistance of counsel, it is important to look at the backgrounds and experience of the attorneys representing him. As noted above, Petitioner was initially represented by James Blackburn and R.L. Adams, from the law firm of Smith, Helms, Mulliss and Moore. The superior court found that Blackburn and Adams requested discovery from the state and enlisted to services of an experienced private detective, Randy Montague to supplement to discovery. (Order denying MAR p. 2). The court also determined that Blackburn and Adams spent approximately four hundred and fifty hours in investigation and preparation of the case. *Id.* When Blackburn was forced to withdraw, Adams continued to work on the case with L. Michael Dodd who was selected by Petitioner to replace Blackburn. Dodd had practiced criminal law for seventeen years, with his total practice involving the defense of criminal charges for the preceding ten years. *Id.* Dodd had represented more that sixty defendants charged with murder and has been qualified by the North Carolina State Bar Board of Legal Specialization as a specialist in the field of state and federal criminal law.

For the most, part Petitioner's contentions center around trial counsel's defense strategy. His claims that trial counsel were ineffective for failing to object to testimony including inadmissible out-of-court statements, failing to interview witnesses who were essential to his defense, failing to adequately prepare to confront or cross-examine the testimony of the State's canine expert, failing to object to Eva Marie Kelly's testimony, failing to object to prosecutor's improper statements in his closing argument, and failing to advise Petitioner as to whether he should testify in his own defense, all relate to trial tactics as gleaned from the record. Both Attorney Dodd, in his testimony in the post-conviction proceedings, and Attorney Adams, in his affidavit, contend that their defense strategy was to call no witnesses and to leave it to the government to prove its case. Dodd further avers that his failure to object to the hearsay statements was part of his strategy to point out the improper tactics used by the police to elicit statements from Petitioner and Johnny Beck, his co-defendant. Moreover, he states that he, after consulting with Petitioner and Adams, determined that it would be more to their advantage not to call witnesses in Petitioner's defense in order to preserve the right to have final closing arguments.

Unsuccessful trial tactics, standing alone, neither constitute prejudice nor definitively prove ineffective assistance of counsel. *Bell v. Evatt*, 72 F.3d 421 (4th Cir. 1995), *cert. denied*, 518 U.S. 1009 ((1996). To succeed on an ineffective assistance of counsel claim, Petitioner must overcome the presumption that the challenged action may be considered an appropriate and necessary trial strategy under the circumstances. *Strickland*, 466 U.S. at 689. Whether or not Petitioner consented to trial strategy is

probative of the reasonableness of trial counsels' performance. See Bell, 72 F.3d at 429.

There is no question concerning the credentials of the attorney's who represented Petitioner. Therefore, the court will first address Petitioner's contention that he was not properly advised as to the pros and cons of his testifying on his own behalf. Trial counsel state that they consulted with Petitioner regarding his right to testify, pointing out the pros and cons of Petitioner's taking the stand. However, Petitioner, in his affidavit states that he was not adequately advised by counsel as to whether he should take the witness stand. The state court, after throughly reviewing the evidence presented at the MAR hearing, concluded that there was no credible evidence that defendant was not adequately advised of his right to testify. Petitioner states in his affidavit that counsel's reasons for not allowing him to testify are inaccurate. However, even if the court were to determine that Petitioner was not adequately advised of his right to testify, there is no evidence to show that he was prejudiced as a result. Petitioner has not demonstrated that he could have offered any evidence in addition to that already before the jury by way of the statements to the police following the incident. Therefore, the state court finding that Petitioner was fully and adequately advised of his right to testify at trial was not unreasonable under the circumstances, nor contrary to federal law as established by Supreme Court in Strickland.

Turning to Petitioner's contention that his attorneys were ineffective due to their failure to object to certain hearsay statements made by a co-defendant to the investigating officer. Mr. Dodd testified during the MAR hearing before Judge Farmer, that testimony concerning statements the co-defendant made which were contradictory to Petitioner's statements were hearsay. During his tape recorded interview, Petitioner stated that he

and the co-defendant saw the body lying where the victim was later found, and that the co-defendant had called his attention to the fact that someone was standing in the circle over the victim's body. Mr. Dodd, without objecting, allowed the State to elicit testimony from Detective Howard that the co-defendant stated that he did not see any other person near or around the body. Dodd claims he did not object and allowed the co-defendant's testimony as a trial tactic, because he wanted to ask the detective about his "unconscionable" tactics used in questioning both the co-defendant and Petitioner. (MAR tr. pp. 18-19.). The superior court rejected Petitioner's claim that trial counsel were ineffective for failing to object to the hearsay testimony of Detective Howard regarding a statement given to him by the co-defendant, Johnny Beck. Rather, the superior court pointed out that trial counsel were aware that Howard's statement would be objectionable hearsay, but as a part of their trial strategy wanted to use this as way to question the detective about the manner used to question each defendant and to show the jury that in spite of the "unconscionable" tactics, both Petitioner and Beck continued to deny involvement in the murder. (Order denying MAR p. 4). The superior court concluded that trial counsel did illicit testimony in length about questionable methods used by the detective and testimony concerning both defendants' assertions of innocence. Therefore, the court's findings that trial counsel's actions were reasonable and that Petitioner was not prejudice as a result are not contrary to, nor do they involve an unreasonable application of the standard set forth in *Strickland*.

Petitioner next contends trial counsel was ineffective for failing to adequately prepare for trial because they did not interview witnesses who were essential to his defense. Petitioner specifically argues that counsel did not try to find witnesses who were

11

in the cell with Petitioner and Ernest Andrews, the inmate who testified that Petitioner made a jailhouse confession. In this case, counsel had a transcript of Andrews' tape recorded statement and thus they were aware of the nature of his testimony. Andrew's statement that there were other inmate's present when Petitioner allegedly made the first statement incriminating himself, indicated that there were other potential witnesses who could have possibly refuted Andrews' testimony. In his affidavit, R. L. Adams stated that Petitioner suggested that they have some of the inmates from his cellblock testify. Adams, however, states that this idea was not followed through on because none of the inmates were with Petitioner for twenty-four hours a day and therefore could not testify that it was impossible for Petitioner and Andrews to have had the conversation. Apparently, Petitioner's current counsel was able to find witnesses who also shared the jail cell with Petitioner when he was first arrested. After reviewing the testimony of the two inmates, Judge Farmer determined that they gave little evidence of value which would tend to refute Andrews' statements. A review of the testimony of the witnesses who supposedly would have aided Petitioner's defense shows that their testimony would have offered little or nothing to rebut Andrew's assertions concerning Petitioner's jailhouse confession. (See MAR tr. pp. 3-33). At most, their testimony merely demonstrated that Petitioner never confessed to them. Thus, the court concludes that Petitioner was not prejudiced by trial counsel's the tactical choice and their decision not to use these witnesses did not amount to profession dereliction.

Petitioner claims that trial counsel's deficiencies in failing to obtain an expert to deal with the bloodhound evidence and to object to tainted identification evidence were

prejudicial under the *Strickland* standard. The evidence in question has to do with the testimony concerning the trailing of the victim's scent to Petitioner's vehicle which was stuck near a service road off the circle and the identification of Petitioner by Eva Marie Kelly.

With regard to the bloodhound evidence, the record shows that counsel objected at trial to this evidence and that there was an extensive *voir dire* hearing. Through a suppression motion and cross-examination trial counsel demonstrated the recognition of the legal issues involved in this kind of testimony. Moreover, the evidence provided at the MAR hearing by Jonni Joyce, who at the time was a sergeant with the Zebulon Police Department and a professional canine trainer, shows that such rebuttal evidence would not have aided Petitioner's defense. Instead, this merely served as a look at the evidence in hindsight not as an indication of any deficient performance on the part of trial counsel in dealing with this evidence.

Respondent argues, however, that even if the failure of the attorneys to hire a separate bloodhound expert amounted to ineffective assistance, there was no prejudice because the bloodhound evidence was duplicative. Respondent concludes that the Kelly's testimony placed the victims in Petitioner's presence and in his car shortly before she was killed.

Even so, Petitioner asserts that trial counsel was ineffective for failure to object to the testimony of Kelly who testified in exchange for sentence concessions. He contends the identification was the result of an impermissibly suggestive photographic "showup." The state court found, following the MAR proceeding, that "based on the circumstances

13

of the witnesses' viewing, twice outside at close range and once face to face in the lighted kitchen and the certainty of her identification only a short time after seeing the defendant would have allowed her identification even if the original photo viewing was suggestive." (Order denying MAR p. 6). This determination by the state court is reasonable in view of the fact that Kelly had at least one good opportunity to see Petitioner when he and his co-defendant called her to his truck, thus establishing that the in-court identification had an independent origin. See *Simmons v. United States*, 390 U.S. 377 (1968).

Finally, Petitioner claims counsel were ineffective for failing to object to prosecutor's improper statements in his closing argument. The allegedly improper arguments were as follows: (1) "[g]enerally, in a homicide, there's two kinds of parties there, the victim who can't say anything, and the perpetrator, who won't say anything;" (2) "[t]he defendant has got to explain something to you;" and (3) "[i]t's your duty to speak for the people of the State of North Carolina when there's another side to what Mr. Dodd says and I know y'all will do that even though I can't do it because obviously I'll be sitting there with my turn having come and gone but don't think that I'm not wishing that I had, that I'm not wishing that I had spoken about something that he mentioned when there's another side." Petitioner contends these comments as found in 1 and 2, violate his right not to be a witness. The court finds that these comments alone, although improper, did not prejudice Petitioner where they were not extensive. Similarly, the court finds that comment 3, which was an isolated comment did not prejudice Petitioner. The court therefore determines that trial counsel was not ineffective for failing to object to the comments at issue.

## CONCLUSION

Accordingly, the court finds that the evidence viewed as a whole, does not raise a reasonable probability that the result of Petitioner's trial would have been different were it not for counsel's deficient performance and that Petitioner has failed to demonstrate the existence of genuine issues of material fact. Therefore, the court having found no violations of federal or constitutional laws, Respondent's motion for summary judgment is GRANTED as to all claims raised in Petitioner's habeas corpus petition.

SO ORDERED this 11th day of September 2000.

MALCOLM J. HOWARD
United States District Judge